1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN LOUIS JENNINGS, | Case No. 1:20-cv-01180-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |

_____/

## I.   INTRODUCTION

Plaintiff Marvin Louis Jennings ("Plaintiff") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the Acting Commissioner of Social Security (the "Acting Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title XVI of the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. _See_ https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  _See_ 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (_See_ Doc. 10.)

## II.      BACKGROUND

On November 17, 2016, Plaintiff filed protectively an application for DIB payments, alleging that he became disabled on December 14, 2014, due to left shoulder pain, anxiety, bilateral knee pain, frequent urination, stress, depression, and rhabdomyolysis.  (Administrative Record ("AR") 19, 79. 80, 97, 98, 116, 122, 261, 265, 280, 297.)  Plaintiff was born on May 16, 1969, and was 45 years old on the alleged onset date.  (AR 28, 79, 97, 261, 280, 297.)  He has a high school education and two years of college.  (AR 28, 44, 266.)  Plaintiff has past work experience as a cook.  (AR 28, 45, 93–94, 113–114, 257, 266.)

### A.      Relevant Evidence of Record[3]

### 1.      Medical Evidence

In February 2014, Plaintiff presented to Central Valley Comprehensive Care complaining of work-related anxiety.  (AR 364.)  He felt that management was retaliating against him for workers compensation issues, causing increased anxiety.  (AR 364.)  Plaintiff was prescribed Xanax.  (AR 364.)

Plaintiff reported to Kings Industrial Occupational Medicine in April and May 2014 that he was "getting complaints from multiple coworkers" and "felt harassed in the workplace."  (AR 432, 435)  It was noted that he had been "treating with a psychologist" and had "ongoing therapy scheduled."  (AR 432.)  Plaintiff was diagnosed with "Stress, Acute Situational Disturbance." (AR 432, 435.)  In July 2014, Plaintiff made the same complaints, and reported going to counseling "regularly."  (AR 453.)

That same month, Plaintiff underwent a "Psychological Panel Qualified Medical Evaluation" by Lexi Welantez-Bursin, Psy.D, Q.M.E.  (AR 499–555.)  She noted Plaintiff was seeing a therapist weekly until she retired in June 2014.  (AR 526.)  He was diagnosed with "Adjustment Disorder with Mixed Anxiety and Depressed Mood" and "Narcissistic Personality Disorder."  (AR 535.)  Dr. Welantez-Bursin noted Plaintiff's symptoms included "tearfulness, depressed mood, anxiety, panic, irritability, worry, lack of motivation, social withdrawal,

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

cognitive difficulties, and insomnia [that] are consistent with an adjustment disorder with mixed anxiety and depressed mood." (AR 540.) She also noted that Plaintiff's narcissistic personality disorder "contributes to the prolongation and severity of his distress, as well as his reactivity." (AR 541.) Plaintiff was assessed with a Global Assessment of Functioning (GAF) score of 67 "and is based on the presence of overall mild residual psychiatric symptoms (61-70) . . .with mild accompanying social and occupational impairment (61-70) . . . ." (AR 550.) Dr. Welantez-Bursin stated that Plaintiff is "currently demonstrating overall mild symptoms of depression and anxiety with intermittent flare-ups." (AR 550.) She found Plaintiff had minimal impairment in activities of daily living, concentration, and memory; mild impairment in social functioning; and mild-to-moderate impairment in adaptation to stressful situations. (AR 551.) Dr. Welantez-Bursin recommended that Plaintiff be precluded from returning to work under the supervision of his existing supervisor Fay Wilson, with whom he had conflict since 2008, and to be transferred to another facility to perform his duties as a jail cook. (AR 515–553.) She stated that there is "no information obtained in the evaluation to suggest any type of psychological impairment that would prevent him from working" for his current employer. (AR 554.)

In March 2015, Plaintiff presented for an initial evaluation at Kings Counseling Center. (AR 1195.) The therapist found support for a diagnosis of "Adjustment Disorder" and indicated that they expected to see "significant improvement in overall functioning within three months." (AR 1197.) After two therapy sessions in April 2015, Plaintiff reported that he was doing "fairly well" and was discharged. (AR 1193, 1194.)

Plaintiff again complained of stress and anxiety to Kings Industrial Occupational Medical Center in May 2015. (AR 562.) He reported that he "accepted some sort of resignation/retirement from his position at the county," but had not been "notified regarding what that means as far as any treatment or counseling moving forward . . . ." (AR 562–63.)

In August 2015, Plaintiff requested an increased dosage of clonazepam because his starting school was "causing increased anxiety." (AR 1162–66, 1461.) His mental status examination showed anxious mood and affect, but was otherwise normal. (AR 1163.) He was assessed with "Facial Tic Disorder exacerbated by anxiety." (AR 1163.) Fluoxetine was

recommended, but Plaintiff declined.  (AR 1161, 1459.)

Plaintiff presented to clinical psychiatrist Avak A. Howsepian, M.D., and Licensed Clinical Social Worker (LCSW) Margaret Russell at the Fresno VA Medical Center in March 2017 for a mental health evaluation.  (AR 1215–23.)  Plaintiff exhibited pronounced facial tic, and reported symptoms of insomnia, anxiety, depressed mood, anhedonia, extreme fatigue, irritability, and memory difficulties.  (AR 1216.)  He stated he had participated in therapy on and off for the past seven years to address work stress.  (AR 1217.)  Plaintiff reported being "so anxious [] and tired all the time." (AR 1222)   A mental status examination performed by LCSW Russell noted Plaintiff's tics and tremors, restricted affect, and anxious, irritable, and angry mood.  (AR 1220.)  She assessed Plaintiff's memory as "impaired," and diagnosed him with "Anxiety Disorder, Tic, Adjustment Disorder with Depression, [and] Insomnia."  (AR 1222.) LCSW Russell recommended psychotherapy and that he attend anger group therapy.  (AR 1222.)

In April 2017, Plaintiff established treatment with LCSW Russell for his generalized anxiety disorder.  (AR 1390, 1408–09.)  When LCSW Russell recommended group therapy, Plaintiff became "highly anxious," and stated he had not been in a group before.  (AR 1390, 1408.)  He reported he becomes "reactive and angry about injustices and fairness."  (AR 1390, 1408.) LCSW Russell observed Plaintiff's anxious mood, and noted that he "isolates and reduces stimulus and anxiety by this behavior which reinforces the anxiety."  (AR 1391, 1409.)

Plaintiff attended two therapy sessions in May 2017 with LCSW Russell, during which he discussed his relationship issues and agreed to participate in group therapy for anger issues.  (AR 1389–90, 1404, 1407–08.)  LCSW Russell observed Plaintiff exhibited an anxious mood and visible facial tic.  (AR 1389–90, 1407–08.)  Plaintiff continued to see LCSW Russell on a monthly basis from October 2017 to February 2018.  (AR 1602.)  In January 2018, he presented with anxious mood, "perfectionist, ruminating thoughts, [and] avoidance."  (AR 1607.)  He was negative for a depression screening.  (AR 1607.)  LCSW Russell noted in February 2018 that Plaintiff's mood was anxious, with "obsessive thinking" and "isolation."  (AR 1605.)  Plaintiff was also observed to exhibit a facial tic and a "[l]ow tolerance for stress."  (AR 1605.)

In January 2018, Dr. Howsepian telephoned Mr. Jennings to discuss issues with Plaintiff's

attempt to work.  (AR 1605)  Plaintiff reported being unable to work with his immediate supervisor and was "[s]tressed by this arrangement. So long as she is his immediate supervisor, he feels he is not able to continue working."  (AR 1605.)  Dr. Howsepian diagnosed Plaintiff with Unspecified Anxiety Disorder and Obstructive Sleep Apnea ("OSA").  (AR 1605.)

In April 2018, Plaintiff had his last therapy session with LCSW Russell due to her impeding retirement.  (AR 1603.)  He reported that he could not attend group anxiety therapy sessions because "he could not afford the gas given that he lives in Kings County."  (AR 1603.)  According to LCSW Russell, Plaintiff accepted a psychiatric consult with Dr. Howsepian and committed to "pursu[ing] counseling closer to his home as it difficult for him to drive over an hour for his appointments."  (AR 1603.)  Upon examination, LCSW Russell noted Plaintiff's anxious mood, slight facial tic, and fair judgment and insight.  (AR 1603.)

Plaintiff presented to Dr. Howsepian in June 2018 during a "stressful period of transition" when he was moving residences.  (AR 1586–87.)  He requested a marital therapist due to "[m]arital strain."  (AR 1586.)  Dr. Howsepian noted Plaintiff was "somewhat anxious" with "[b]aseline facial tics" but that he had a "bright mood."  (AR 1586.)  He was assessed with a history of anxiety disorder and "[r]ule out current unspecified anxiety disorder."  (AR 1568.)  Dr. Howsepian also noted Plaintiff's obsessive compulsive ("OC") symptoms.  (AR 1586.)

In October 2018, Plaintiff reported to Dr. Howsepian that he and his fiancée are no longer seeing each other, and he is homeless.  (AR 1534.)  He stated he was taking clonazepam for anxiety.  Dr. Howsepian noted Plaintiff was "[l]ess anxious, more calm" and his facial tic frequency had decreased.  (AR 1535.)  Plaintiff was recommended to continue using medications as prescribed, including clonazepam twice a day for anxiety  (AR 1533, 1535.)  Plaintiff's visit with Dr. Howsepian in February 2019 showed Plaintiff was less anxious and less verbal.  (AR 1524–25.)

Plaintiff presented for a psychological evaluation in April 2019 conducted by LCSW Rebecca Jane Gibson, whom he had seen prior in couple's counseling.  (AR 1691–99.)  He reported increasing irritability, headaches, pain, anxiety, sleep apnea and difficulty falling asleep. (AR 1692.)  LCSW Gibson diagnosed Plaintiff with Tourette's syndrome, "[a]djustment disorder

with anxiety," and "[f]acial tic."  (AR 1695.)  LCSW Gibson saw Plaintiff for a therapy session that same month, at which she noted Plaintiff had an anxious mood and affect with congruent behavior.  (AR 1699)  She assessed his thought process as appropriate, his judgment "sensible" and "[a]ppropriate in social situations."  (AR 1699.)  Plaintiff was noted to be "progressing as expected."  (AR 1699.)

### 2.    Opinion Evidence

In February 2017, licensed psychologist Pauline Bonilla, Psy.D., performed a comprehensive psychiatric examination of Plaintiff.  (AR 1294–98.)  She observed Plaintiff to have fair hygiene and grooming.  (AR 1296.)  Plaintiff was cooperative throughout the interview and was considered a "reliable historian."  (AR 1294.)  He complained of anxiety starting around 2007 because of stress while at work and "chronic conflicts with his supervisor."  (AR 1295.)  Plaintiff also reported having developed facial tics because of the anxiety.  (AR 1295.)  Plaintiff's anxiety symptoms included shortness of breath; increase in heart palpitations; chest tightening; muscle tension; sweatiness and shakiness; and dizziness.  (AR 1295.)

Upon mental examination, Dr. Bonilla found Plaintiff's thought content was appropriate with no indications of hallucinations or delusions.  (AR 1296.)  Plaintiff's mood appeared to be euthymic with poor sleep.  (AR 1296.)  Dr. Bonilla assessed Plaintiff with an unspecified anxiety disorder.  (AR 1297.)  According to Dr. Bonilla, Plaintiff's symptoms "appear[ed] to be in the mild to moderate range" and he "appear[ed] to be suffering from a major mental disorder."  (AR 1298.)  The likelihood of recovery by Plaintiff was deemed to be good with psychotherapy.  (AR 1298.)  Dr. Bonilla noted that Plaintiff's limitations appeared to be "primarily due to a combination of medical and mental health issues."  (AR 1298.)

Dr. Bonilla opined that Plaintiff was mildly impaired as follows: in the ability to perform detailed and complex tasks; the ability to accept instruction from a supervisor; the ability to sustain an ordinary routine without special supervision; the ability to maintain regular attendance in the workplace; and the ability to complete a normal workday or workweek without interruptions from a psychiatric condition.  (AR 1298.)  Dr. Bonilla further opined that Plaintiff is moderately impaired in the ability to interact with coworkers and the public and the ability to deal

6

with stress and changes encountered in the workplace.  (AR 1298.)  Dr. Bonilla found the likelihood of Plaintiff "emotionally deteriorating in a work environment" was minimal.  (AR 1298.)

Plaintiff's treating psychiatrist Dr. Howsepian, who had seen Plaintiff seven times since March 2017, completed a "Mental Medical Source Statement" form in June 2019.  (AR 1733–35.)  He noted Plaintiff's history of unspecified anxiety disorder, obstructive sleep apnea hypopnea syndrome, and chronic motor tic disorder.  (AR 1733.)  Plaintiff's prognosis was listed as "fair."  (AR 1733.)

Dr. Howsepian opined that Plaintiff's mental impairment precluded his ability to remember locations and work-like procedures for 5 percent of the workday and to understand and remember detailed instructions for 10 percent or more of the workday.  (AR 1733.)  Dr. Howsepian explained that Plaintiff is "[p]rone to modest cognitive disorganization due to anxiety/stress."  (AR 1733.)  Dr. Howsepian further opined that Plaintiff is precluded from maintaining attention and concentration for extended periods of time and carrying out detailed instructions for at least 10 percent of the workday.  (AR 1733.)  He also opined that Plaintiff would be precluded from maintaining regular attendance, performing activities within a schedule, being punctual, working in proximity to others without being distracted, performing at a consistence pace, and completing a normal workday/workweek without interruptions due to psychological symptoms for 5 percent of an eight-hour workday.  (AR 1733.)  Dr. Howsepian also opined that Plaintiff would be precluded from accepting instructions, and responding appropriately to criticism from supervisors for 5 percent of the workday.  (AR 1734)  According to Dr. Howsepian, Plaintiff would likely be absent from work one day per month due to psychological symptoms.  (AR 1734.)

**B.     Administrative Proceedings**

The Acting Commissioner denied Plaintiff's application for benefits initially on March 20, 2017, and again on reconsideration on June 30, 2017.  (AR 116–20, 122–27.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 128–44.)  At the hearing on August 7, 2019, Plaintiff appeared with counsel and testified before

an ALJ as to his alleged disabling conditions.  (AR 38–77.)

### 1.      Plaintiff's Testimony

Plaintiff testified that his anxiety causes him to lose concentration and confidence, causing thoughts of inadequacy related to the inability to perform a simple task.  (AR 56.)  He stated that he experiences stress every day and it affects his ability to function.  (AR 59.) According to Plaintiff, he has difficulty being around people he does not know and crowds of people, which is why he stays home.  (AR 60–62.)  He has had "six or seven" panic attacks. (AR 61.)  Plaintiff stated his anxiety can cause anger.  (AR 64.)  He testified that he was currently seeing a psychiatrist through the VA and a therapist at Hanford Adventist Health. (AR 62.)  According to Plaintiff, he was also taking clonazepam for facial tics and anxiety.  (AR 69.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") indicated that Plaintiff had past work as a cook at the jail, Dictionary of Operational Titles (DOT) code 313.361-014, which was medium exertional and skilled work, heavy as performed, with a specific vocational preparation (SVP)[4] of 7.  (AR 71.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background.  (AR 72.)  The VE was also to assume this person was limited to light exertional activity, with the additional limitations of occasional reaching overhead bilaterally and no climbing of ropes, ladders, or scaffolding.  (AR 72.)  The VE testified that such a person could not perform Plaintiff's past work, but could also perform other light, unskilled work in the national economy such as information clerk, DOT code 237.367-018, SVP 2; office helper, DOT code 239.567-010, SVP 2; and host, DOT 349.667-014, SVP 2.  (AR 72–73.)  The ALJ asked a follow up question regarding a second hypothetical worker who had an additional requirement of unscheduled rest breaks during the day every 30 minutes for 30 minutes, and the VE testified that such limitation would preclude all work.  (AR 74–75.)  The VE further testified that there would

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

be no work for an individual who reached a level of two absences a month throughout the year. (AR 75.)

Finally, Plaintiff's attorney inquired of the VE whether the individual in the first hypothetical who would also be off task approximately ten to 15 percent of the time could perform Plaintiff's past work or any work in the national economy.  (AR 75.)  The VE testified that that there would be no work that such individual could perform.  (AR 75.)

**C.    The ALJ's Decision**

In a decision dated September 5, 2019, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 19–30.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520.  (AR 21–30.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since December 14, 2014--the alleged onset date (Step One).  (AR 21.)  At Step Two, the ALJ found Plaintiff's following impairments to be severe: obesity and medical history of bilateral rotator cuff tears.  (AR 21.)  The ALJ further found that Plaintiff's anxiety disorder nonsevere because it "showed little limitations, if any, with only intermittent treatment" and thus "do[es] not cause more than a minimal limitation on his ability to function/work."  (AR 23)  Moreover, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three).  (AR 24–25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff retained the RFC:

> to perform light work as defined in 20 CFR [§] 404.1567(b), except he is limited to occasional bilateral overhead reaching.  He has no limitations in postural changes including climbing of ramps and stairs, but he is precluded from climbing ladders, ropes and scaffolds.

(AR 25.)    Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not

1  entirely consistent with the medical evidence and other evidence in the record." (AR 26.) The
2  ALJ found that, on the basis of the RFC assessment, Plaintiff could not perform his past relevant
3  work (Step Four), but retained the capacity to perform other work that existed in sufficient
4  numbers in the national economy, such as information clerk, office helper, and host. (AR 28–29.)
5  The ALJ concluded that Plaintiff was not disabled at any time through the date of his decision.
6  (AR 29–30.)

7      Plaintiff sought review of this decision before the Appeals Council, which denied review
8  on June 19, 2020. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the
9  Acting Commissioner. 20 C.F.R. § 404.981.

10                              **III.    LEGAL STANDARD**

11 **A.    Applicable Law**

12      An individual is considered "disabled" for purposes of disability benefits if he or she is
13 unable "to engage in any substantial gainful activity by reason of any medically determinable
14 physical or mental impairment which can be expected to result in death or which has lasted or can
15 be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §
16 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if
17 [their] physical or mental impairment or impairments are of such severity that [they are] not only
18 unable to do [their] previous work but cannot, considering [their] age, education, and work
19 experience, engage in any other kind of substantial gainful work which exists in the national
20 economy." *Id.* § 423(d)(2)(A).

21      "In determining whether an individual's physical or mental impairment or impairments
22 are of a sufficient medical severity that such impairment or impairments could be the basis of
23 eligibility [for disability benefits], the Commissioner" is required to "consider the combined
24 effect of all of the individual's impairments without regard to whether any such impairment, if
25 considered separately, would be of such severity." *Id.* § 423(d)(2)(B). For purposes of this
26 determination, "a 'physical or mental impairment' is an impairment that results from anatomical,
27 physiological, or psychological abnormalities which are demonstrable by medically acceptable
28 clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process").  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.      Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

11

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in two respects: (1) the ALJ erred in finding at Step Two that Plaintiff's mental impairment of anxiety was not severe in view of the medical opinion evidence; and (2) the ALJ failed to articulate specific, clear, and convincing reasons for discounting Plaintiff's testimony regarding his subjective complaints. (*See* Doc. 19 at 28–37; Doc. 21 at 4–8.) Defendant counters that the ALJ's Step Two finding was supported by the record, and his credibility assessment of Plaintiff was appropriate because Plaintiff's allegations of disability were inconsistent with the record. (Doc. 20 at 16–24.)

**A.     The ALJ Committed Harmful Error at Step Two by Failing to Determine Plaintiff's Mental Impairment Was Severe**

**1.     Legal Standard**

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)). "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and TITLES II & XVI: THE SEQUENTIAL EVALUATION PROCESS, Social Security Ruling ("SSR") 86-8 (S.S.A. 1986)).

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities." *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)). "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." TITLES II & XVI: MED. IMPAIRMENTS THAT ARE NOT SEVERE, SSR 85-28 (S.S.A. 1985). Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR 85–28).

Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Burch*, 400 F.3d at 679 ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis.") (citing *Swenson*, 876 F.2d at 687).

**2.    Analysis**

Plaintiff contends the ALJ erred in determining that Plaintiff's anxiety disorder is non-severe because the ALJ improperly rejected the opinions of evaluating psychologist Dr. Bonilla and treating psychiatrist Dr. Howsepian. (*See* Doc. 19 at 29–33.) The Court agrees.

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen*, 80 F.3d at 1285. "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729,

at *2 (E.D. Cal. Mar. 29, 2010).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 830.  In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)); *see also Lester*, 81 F.3d at 830.  "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'"  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  "The ALJ must do more than state conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Id.*  (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"  *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund*, 253 F.3d at 1157[5], except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional.  *Lester*, 81 F.3d at 831.

Following an examination of Plaintiff, Dr. Bonilla diagnosed him with an unspecified anxiety disorder.  (AR 1297.)  She opined, in pertinent part, that Plaintiff's ability to interact with coworkers and the public and the ability to deal with stress and changes encountered in the workplace were "moderately impaired."  (AR 1298.)  Dr. Howsepian opined that Plaintiff is "[p]rone to modest cognitive disorganization due to anxiety/stress," and as such, for at least 10

---

[5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

percent of the workday, is precluded from maintaining attention and concentration for extended periods of time and understanding, remembering, and carrying out detailed instructions.  (AR 1733.)  Dr. Howsepian further opined that Plaintiff would likely be absent from work one day per month due to psychological symptoms.  (AR 1734.)

The ALJ assigned "no weight" at Step Two to Dr. Bonilla's opined moderate limitations because they "relied extensively on [Plaintiff's] subjective complaints" and was "inconsistent with the longitudinal mental treatment record as a whole, showing only sporadic mental health therapy and treatment after the incident with his supervisor in 2015." (AR 23.)  Dr. Howsepian's opinion was likewise given "no weight" because, as the ALJ explained later in his decision, Dr. Howsepian "consolidated combined [sic] all of [Plaintiff's] impairments to arrive at his mental limitations" and "there does not appear to be consistent psychotherapy and underlying mental health treatment to support his limitations."  (AR 28.)  The Court finds that these reasons are neither legitimate nor supported by substantial evidence.

### a.    Reliance on Subjective Complaints

A physician's opinion may be rejected if it is based on a claimant's subjective complaints that were properly discounted.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion.  *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Ryan*, 528 F.3d at 1199-1200.

Here, the ALJ's conclusion that Dr. Bonilla "relied extensively" on Plaintiff's subjective complaints—as opposed to her own clinical observations—is unsupported.  The ALJ points to no evidence in the record to support this conclusion.  Dr. Bonilla performed a comprehensive psychiatric examination, after which she diagnosed him with an anxiety disorder.  (AR 1297.) Dr. Bonilla also noted, contrary to the ALJ's recitation (*see* AR 25), her observation that Plaintiff "does appear to be suffering from a major mental disorder at this time." (AR 1298.)  The ALJ's conclusion that Dr. Bonilla based her opinion of Plaintiff's moderate limitations in large part on his subjective complaints is not supported by substantial evidence.  *See, e.g., McMath v. Colvin*,

No. 13-CV-05258 RBL, 2014 WL 1930901, at *5 (W.D. Wash. May 14, 2014).

### b.   Consolidation of Plaintiff's Impairments

The ALJ suggests Dr. Howsepian's opined mental limitations were formulated by improperly "consolidat[ing]" all of Plaintiff's impairments.  (*See* AR 28.)  The ALJ's decision does not elaborate on—nor do the parties address in their briefing—this criticism.  In fact, that Dr. Howsepian's opinion is based on a more complete evaluation of the combined impact of Plaintiff's impairments is a reason why it should be given ***greater*** weight.  *See Lester*, 81 F.3d at 833.  As such, this reason, to the extent it formed the basis of the ALJ's rejection of Dr. Howsepian's opinion, it is not a specific and legitimate reason supported by substantial evidence.

### c.   Lack of Regular Treatment

Finally, the ALJ observed that both Drs. Bonilla's and Howsepian's opinions are inconsistent with a medical record showing "sporadic" and a lack of "consistent" mental health therapy and treatment.  (AR 23, 28.)  There is no bright-line rule that the failure to receive mental health treatment can never provide a legitimate reason for rejecting the opinions of an examining or treating physician.  However, in *Nguyen v. Chater*, 100 F.3d 1462 (9th Cir. 1996), "the Ninth Circuit cautioned that in the case of mental impairments, it may not be appropriate to infer based on failure to obtain treatment that a claimant's impairment is not severe."  *Fillmore v. Astrue*, No. C–10–03655 JCS, 2012 WL 298341, at *22 (N.D. Cal. Feb. 1, 2012).  In *Nguyen*, the Ninth Circuit found that the ALJ did not provide a specific and legitimate reason for favoring the opinion of a nonexamining psychologist over that of an examining psychologist. In reaching that conclusion, the Ninth Circuit remarked that a claimant "'may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Nguyen*, 100 F.3d at 1465 (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).

While there are undeniable gaps in the record, the ALJ's overstates Plaintiff's failure to pursue treatment for his anxiety disorder after 2015.  The record indicates that, in April 2017, Plaintiff established treatment with LCSW Russell, attended two therapy sessions in May 2017, and continued to see LCSW Russell on a monthly basis from October 2017 to February 2018.

(AR 1390, 1408–09, 1389–90, 1404, 1407–08, 1602, 1605, 1607.)  Plaintiff had his last therapy session with LCSW Russell in April 2018 due to her impeding retirement (AR 1603), and in June 2018, he presented to Dr. Howsepian for treatment.  (AR 1586–87.)  Plaintiff saw Dr. Howsepian in October 2018 and February 2019 (AR 1524–25, 1533–35), and presented to LCSW Gibson for treatment in April 2019 (AR 1691–99).[6]  At the hearing in August 2019, Plaintiff testified that he was currently seeing a psychiatrist through the VA and a therapist at Hanford Adventist Health.  (AR 62.)  On this record, the Court finds that the ALJ's rejection in part of the opinion of Dr. Bonilla and the wholesale rejection of the opinion of Dr. Howsepian based on Plaintiff's mental health treatment history was flawed, as it was based on a mischaracterization of the record and therefore lacked the factual support of "specific evidence."  *See, e.g., Silvas v. Astrue*, No. 09–cv–00030–JLT, 2010 WL 1241301, at *14 (E.D. Cal. Mar. 26, 2010).

In sum, because none of the justifications offered by the ALJ for his treatment of Drs. Bonilla's and Howsepian's opinions suffice, the ALJ "lacked substantial evidence to find that the medical evidence clearly established [Plaintiff's] lack of" a medically severe mental impairment.  *Webb*, 433 F.3d at 688.  Accordingly, the ALJ's erred at Step Two.

### d.    Harmless Error Analysis

Though this type of error at Step Two is ordinarily harmless where the ALJ otherwise proceeds with the sequential analysis, *see Molina*, 674 F.3d at 1115, the error was not harmless here, because in determining Plaintiff's RFC, the ALJ did not include any functional limitations stemming from Plaintiff's anxiety disorder, including those assessed by Dr. Bonilla.  *See Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir. 2007) (holding that a failure to consider an impairment at Step Two is harmless error where the ALJ includes the limitations of that impairment in the determination of the residual functional capacity).  To the extent that the ALJ "considered" Dr. Howsepian's opined impairments in the RFC determination—insofar as the rationale for his Step

---

[6] The record also indicates that Plaintiff could not afford the gas required to drive to group therapy sessions (AR 1603) and struggled with periods of homelessness (AR 1534.)  The inability to afford treatment is not an appropriate reason to reject a medical opinion.  *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999) (holding that the failure to seek treatment was not a legitimate basis for rejecting a disability claim, if a claimant could not afford treatment); *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) ("'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)).

Two rejection of the opinion appeared in that portion of the decision—the Court has already found that the ALJ's evaluation of that opinion was in error. *See, e.g.*, *Urban v. Saul*, 808 F. App'x 453, 455 (9th Cir. 2020) (concluding that the ALJ's error at Step Two was not harmless because the RFC "identified no limitations stemming from [the claimant's] mental impairment" and the ALJ had "improperly discounted the opinions of three medical providers, including two treating providers, who concluded that [the claimant's] severe depression and anxiety impacted his ability to work."). Had the ALJ assigned any weight to the medical opinions of Drs. Bonilla and Howsepian, it is likely that the ALJ would have included further limitations in Plaintiff's RFC. This easily could have affected the ultimate disability determination.[7] (*See, e.g.*, AR 74–75 (VE's testimony that a requirement of unscheduled rest breaks during the day every 30 minutes for 30 minutes; a limitation of two absences a month throughout the year; and an impairment of being off task approximately ten to 15 percent of the time could perform would each preclude all work).) As a result, the Court cannot conclude with confidence that "no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (quoting *Stout*, 454 F.3d at 1055–56). Therefore, the ALJ's error in his discrediting in part Dr. Bonilla's opinion, and rejecting Dr. Howsepian's opinion outright, at Step Two is not harmless. *See, e.g.*, *Inskeep v. Colvin*, No. 3:15-cv-00759-BR, 2016 WL 3509395, at *4 (D. Or. June 27, 2016) (concluding that the ALJ erred at Step Two when he found Plaintiff's mental impairments are nonsevere and finding that error is not harmless because the ALJ did not include any mental limitations in his assessment of Plaintiff's RFC.) Remand is therefore warranted.

**B.    Remand for Further Proceedings is Appropriate**

The Court has the discretion to remand the case for additional evidence and findings or to

---

[7] The ALJ states that even if he were to include Dr. Bonilla's opined moderate limitations in Plaintiff's RFC "there would still be a significant number of jobs available in the national economy that the claimant could perform," citing SSR 85-15. (AR 29.) That regulation, however, expressly states that a substantial loss of ability to respond to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting—which are the same moderate impairments opined severely limits the potential occupational base. The ALJ does not reference any supporting evidence to the contrary, and therefore his speculation of a substantial occupational basis is an "impermissible stretch." *Stark v. Astrue*, No. C 07-6465 MHP, 2009 WL 2566723, at *8 (N.D. Cal. Aug. 18, 2009). *See also Galinski v. Astrue*, No. C11-516-RSL-JPD, 2011 WL 7070323, at *16 (W.D. Wash. Dec. 16, 2011).

1    award benefits. *Smolen*, 80 F.3d at 1292. The Court may award benefits if the record is fully

2    developed, and further administrative proceedings would serve no useful purpose. *Id.* Remand is

3    appropriate when additional administrative proceedings could remedy defects. *Rodriguez v.*

4    *Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

5            Here, the Court finds that further proceedings are necessary to formulate an assessment of

6    Plaintiff's RFC that takes into account Plaintiff's mental limitations and to determine whether

7    Plaintiff is disabled. Accordingly, the Court remands this matter to the Commissioner for further

8    administrative proceedings. *See, e.g., Simmons v. Colvin*, No. CV 12–06060–AJW, 2013 WL

9    3337666, at *3-4 (C.D. Cal. July 1, 2013) (finding error at Step Two and remanding for further

10   administrative proceedings).

11           In light of the remand required by the ALJ's error at Step Two, the Court finds it

12   unnecessary to address Plaintiff's argument with respect to the ALJ's failure to credit the

13   testimony of Plaintiff, as it concerns evidence of Plaintiff's alleged mental impairment that will

14   be reconsidered on remand.[8] *See, e.g., Cable v. Astrue*, No. CIV S 06-0515 DAD, 2007 WL

15   2827798, at *6–7 (E.D. Cal. Sept. 27, 2007); *Sanchez v. Apfel*, 85 F. Supp. 2d 986, 993 n.10

16   (C.D. Cal. 2000) (having concluded that remand is appropriate because the ALJ erred at Step

17   Two, the court need not consider issues of credibility). On remand, the ALJ will necessarily be

18   required to re-determine Plaintiff's RFC in light of all his impairments—both physical and

19   mental—and the entire record, and to re-consider whether Plaintiff is capable of performing his

20   past relevant work or any other work in the national economy. Proper weight must be given to

21   the opinions of treating and examining physicians. *See Lester*, 81 F.3d at 830; *Smolen*, 80 F.3d at

22   1285. The testimony of Plaintiff must be reevaluated, and if Plaintiff's testimony about the

23   severity of his symptoms is rejected, specific, clear, and convincing reasons must be given for

24   doing so. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *see also Reddick*, 157

25   F.3d at 722.

26   _____

27   [8] *See, e.g.*, AR 56 (Plaintiff's testimony that his anxiety causes him to lose concentration and confidence, causing thoughts of inadequacy related to the inability to perform a simple task.); AR 59 (Plaintiff's testimony that he

28   experiences stress every day and it affects his ability to function); AR 60–62 (Plaintiff's testimony that he has difficulty being around people he does not know and crowds of people, which is why he stays home); AR 61 (Plaintiff's testimony that he has had "six or seven" panic attacks).)

### V.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Marvin Louis Jennings and against Defendant Kilolo Kijakazi, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **January 24, 2022**                            /s/ *Sheila K. Oberto*
                                                    UNITED STATES MAGISTRATE JUDGE